UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF VERMONT

UNITED STATES

    v.                               File No. 2:23-cr-00108

LINOSHKA BARBOSA

**DEFENDANT'S SENTENCING MEMORANDUM**

COMES NOW the Defendant, by and through counsel David C. Sleigh, respectfully submits the following memorandum before her sentencing.

## I.   <u>Procedural Background</u>

On October 5, 2023, Linoshka Barbosa was arrested in the District of Connecticut after a Grand Jury for the District of Vermont returned an Indictment charging her with: Count 1: Conspiracy to distribute fentanyl and 28 grams or more of cocaine base, in violation of 21 U.S.C. §§ 846, 841(a)(1) and 841(b)(1)(B); and Count 2: Possession of firearms in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A). Linoshka has been held since her arrest on October 3, 2023. Linoshka was ordered detained at her initial appearances in Connecticut and Vermont.

On November 7, 2023, the Grand Jury for the District of Vermont returned a First Superseding Indictment charging Linoshka with Count 1: Conspiracy to distribute cocaine base, fentanyl, and 500 grams or more of cocaine, in violation of 21 U.S.C. §§ 846, 841(a)(1) and 841(b)(1)(B); and Count 2: Possession of firearms in furtherance of a

SLEIGH LAW
ATTORNEYS AT LAW
P.O. BOX 278
364 RAILROAD STREET, STE E
ST. JOHNSBURY, VT 05819
(802) 748-5176

drug trafficking crime, in violation 18 U.S.C. § 924(c)(1)(A).

On October 15, 2024, an Information filed with United States District Court of Vermont charged Linoshka with Count 1: Conspiracy to distribute cocaine, cocaine base, and fentanyl, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C); and Count 2: Possession of a firearm in furtherance of a drug trafficking crime for which she may be prosecuted (that being conspiracy to distribute cocaine, cocaine base, and fentanyl), in violation of 18 U.S.C. § 924(c)(1)(A).

On October 15, 2024, pursuant to a plea agreement, Linoshka plead guilty to both counts in the Information, agreeing that she was part of a group of drug traffickers from Hartford, Connecticut, who were distributing cocaine, cocaine base, and fentanyl in the Brattleboro, Vermont, area, and that she possessed a firearm in furtherance of the drug trafficking. In exchange for Linoshka's guilty plea, the government agreed to: (1) Dismiss the superseding indictment; (2) Not file additional federal charges in the District of Vermont based on the defendant's stipulations to certain facts of the offense and relevant conduct; (3) Not to oppose a variance from the applicable guideline range to treat cocaine base as powder cocaine, solely for the purpose of determining the base offense level pursuant to U.S.S.G. § 2D1.1(c); (4) Recommend a sentence of not greater than 262 months; (5) Recommend that the defendant receive a two-point credit for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1(a); and, (6) Move for an additional one-point credit for timely acceptance of responsibility, if the offense level (before acceptance) is 16 or greater.

## II.    Guidelines Application

### a.    Organizers of the Conspiracy USSG § 3B1.1(a)

SLEIGH LAW
ATTORNEYS AT LAW
P.O. BOX 278
364 RAILROAD STREET, STE E
ST. JOHNSBURY, VT 05819
(802) 748-5176

Jeremy White began selling crack and fentanyl in the Brattleboro area before March 2020. He "recruited" Linoshka to come and help him sell the drugs. By any measure, Jeremy White was the organizer of the conspiracy. See, *U.S. v. Caballero*, 93 F. Supp. 3d 209(2015). Compare USSG § 3B1.1(a) and § 3B1.1(b). Alexandre Bonneville's Pre-Sentencing Report (PSR) implies as much. For example, Linoshka describes Jeremy White as bringing people to Vermont to show them how to sell drugs. PSR at ¶ 61. Mr. Bonneville describes Linoshka's initial trips to Vermont by bus and, apparently, episodic. PSR at ¶ 17. Attributing an organizational role to Linoshka is belied by her early participation at the behest of Jeremy White.

Further, Mr. Bonneville's PSR states that Linoshka's supplier was Jeremy White, PSR at ¶ 16, and that the "group's primary suppliers" were Gina Colon and Jeremy White's father, Leonard White, Sr.[1] PSR at ¶ 47 (Search of Gina Colon's Residence.) Media reports from Connecticut identify the higher-ups in the so-called "Get Money Steppas" as Jeremy White, Guilberto Mendez, Leonardo Laboy, Paul Downer, and Juan Perez. https://www.wfsb.com/2024/04/10/get-money-steppas-group-busted-by-hartford-police-murder-racketeering-drugs/. Linoshka was sought as an apparent underling when comparing court bond amounts. *Id*.

To the extent there was a hierarchy, the organizers were Gina Colon and the Whites. Jeremy White established the business in Vermont and recruited Linoshka. Linoshka was never an "organizer." She may have become a "manager" sometime in 2021. USSG § 3B1.1(b).

**b.  Drug Quantity Exaggeration**

SLEIGH LAW
ATTORNEYS AT LAW
P.O. BOX 278
364 RAILROAD STREET, STE E
ST. JOHNSBURY, VT 05819
(802) 748-5176

---

[1] Within his PSR, Mr. Bonneville also claims that Linoshka's mother, Zoquia Delvalle-Barbosa, was a supplier. Linoshka disputes that assertion.

Within his PSR, Mr. Bonneville calculates the drug quantity based entirely on the statements of Neilena Bollman. First and foremost, Neilena Bollman's statements are inherently unreliable. See, *U.S. v. Ruth*, 578 F. Supp. 3d 392 (2022). They are self-serving and proffered to lessen her sentence. Further, her assertions of Linoshka's continuous and uninterrupted participation are primarily uncorroborated. *Id*.

They are also facially misleading as they would portray Linoshka's presence in Vermont as continuous from March of 2020 to the time of her arrest. Of course, that is not true. Mr. Bonneville's PSR notes that in March of 2023, the primary sales location, 33 Oak Street, Apartment 4, was occupied by Steven Holway, Neilena Bollman, Jereme Schoff, Meghan Morse, Chevire Vickery, Elias Lopez and Jayden Rios, not Linoshka. PSR at ¶ 41.

After Oak Street was raided, the sales operation moved to 14 Birge Street, Apartment 101. The residence was occupied by Elias Lopez, Jayden Rios and Neilena Bollman, not Linoshka. PSR at ¶ 42.

After Birge Street was raided, the group relocated to 84 Linden Street. That address was raided in August 2023, and was occupied by Elias Lopez, Jayden Rios, William Roy, Addyson Morgan, and Michael White, not Linoshka. PSR at ¶ 46.

Linoshka was in Connecticut from late spring 2023 up until the time of her arrest in October. In fact, she was on probation there and submitting to weekly drug screenings. See, Defense Exhibit A, Drug Screening Records, Village for Families and Children, Inc., (May 15 – September 27, 2023) (attached hereto).

All of this is important because considering other evidence, including Linoshka's employment at FedEx, it shows that Linoshka's presence in Vermont and her

SLEIGH LAW
ATTORNEYS AT LAW
P.O. BOX 278
364 RAILROAD STREET, STE E
ST. JOHNSBURY, VT 05819
(802) 748-5176

participation in the conspiracy was episodic and not continuous. Drug quantity attributable to a defendant includes transactions in which they participated directly, transactions they knew of or were reasonably foreseeable to them, and quantities they agreed to distribute or possess with intent to distribute. *U.S. v. Pauling*, 924 U.S. F. 3d 649 (2019). A blanket calculation such as the one utilized in the PSR is easy, but does not fairly reflect the quantity attributable to Linoshka.

### c.  Neilena Bollman's Allegation Linoshka Told Her to Mislead the Police

The PSR quotes Neilena Bollman as saying Linoshka told her to describe the Williams homicide as a suicide. Linoshka never said such a thing. PSR at ¶ 45; See, *Ruth*, infra.

### III.    18 U.S.C. § 3553 Factors

### a.  Linoshka Barbosa's Familial History

Linoshka Barbosa was born on January 25, 2000, in Puerto Rico. Linoshka spent the first six years of her life in the Residential Luis Lloréns Torres, the largest public housing complex in Puerto Rico. The Lloréns Torres complex is well known – one may even say notorious – for violent crime and drug trafficking. According to Wikipedia's entry for "Residencial Luis Lloréns Torres," the neighborhood has been a center of the illegal drug trade in Puerto Rico for decades and has long suffered from gang violence (2025, Wikipedia).

It is worth noting that Luis Lloréns Torres (1876 - 1944), the namesake of Linoshka's community of origin, wrote "The Valley of Collares," the national poem of Puerto Rico. The poem speaks to the universal inner conflicts of all humans while also

SLEIGH LAW
ATTORNEYS AT LAW
P.O. BOX 278
364 RAILROAD STREET, STE E
ST. JOHNSBURY, VT 05819
(802) 748-5176

paralleling the history of the Puerto Rican people — "From their transition from a rural society under Spanish rule to an industrialized society as an American Commonwealth," which resulted in the massive internal migration of Puerto Ricans to the mainland United States. Eugenio M. Rothe, *Luis Llorens Torres and the Impossible Return: Identity, Conflict and Hope in the National Poem of Puerto Rico*, Journal of American Academy of Psychodynamic Psychiatry and Psychoanalysis, 33(2), 351-62 (2005), https://pubmed.ncbi.nlm.nih.gov/16570531/. Torres' poem represents the transformation into adulthood, the longing to return to simpler times, and the promise of new beginnings — all of which speak to Linoshka's journey.

Linoshka was born to a married couple, 18-year-old Zoquia Delvalle-Barbosa and Carlos Rivera Barbosa. Linoshka's mother found Linoshka's name in a Russian book. Linoshka's parents were both born and raised in Puerto Rico. Linoshka has extended family in Puerto Rico, including her mother's and father's sides. Linoshka identifies as a Latina woman of Puerto Rican origin.

Zoquia was raised in poverty by a single, verbally abusive mother. Linoshka does not know how far her mother went in school. Linoshka knows nothing about her father's childhood.

Zoquia and Carlos had two daughters, Linoshka and Karialys, born in 2001. Zoquia and Carlos divorced, and Zoquia had two more children with another man: a daughter, Jornelys, in 2006 and a son, Jadieo, in 2008. Jornelys was born with a detached hip, and Jadieo is autistic.

Around 2004/2005, Carlos went to prison for five years. At about that time, Zoquia was encouraged by the family to move to Connecticut for Jornelys since

SLEIGH LAW
ATTORNEYS AT LAW
P.O. BOX 278
364 RAILROAD STREET, STE E
ST. JOHNSBURY, VT 05819
(802) 748-5176

Connecticut hospitals were better equipped to address Jornelys' detached hip. Linoshka's grandmother, uncle, and aunt already resided in Hartford, Connecticut, and Zoquia and the children joined their extended family in Connecticut. The extended family all lived together in a single-bedroom apartment.

In Connecticut, Linoshka grew up in the North End neighborhood of Hartford, which Linoshka describes as a "ghetto." Over the years, Linoshka's family traveled back to Puerto Rico for visits but never lived there again full-time. For the next few years, life was relatively good. Linoshka enjoyed a close relationship with her grandmother and aunt. Linoshka's grandmother took Linoshka and her siblings to the local park and programs run by Mi Casa Family Services. Linoshka's grandmother worked as a janitor for Mi Casa Family Services.

As far as Linoshka is aware, neither of her parents ever had a substance abuse problem. When Linoshka was around 10—12 years old, she witnessed her mother being abused, both physically and emotionally, by a boyfriend. The abusive relationship eventually ended.

Linoshka's family was poor. Linoshka is not sure what level of public assistance her mother received other than an EBT card. Linoshka's grandmother used a food shelf. When food was in short supply, Linoshka's mother fed the children before herself. Before his untimely death, Linoshka's father, Carlos, sent money from Puerto Rico.

Zoquia went "above and beyond" as a mother. Linoshka felt her family was safe and stable while her father was still alive. Carlos called Linoshka every day from jail and helped her with homework. In 2009, Carlos was released from prison. Carlos had an upcoming trip to Connecticut to see Linoshka and the rest of the family. Shortly before

SLEIGH LAW
ATTORNEYS AT LAW
P.O. BOX 278
364 RAILROAD STREET, STE E
ST. JOHNSBURY, VT 05819
(802) 748-5176

his departure, he was murdered. Instead of reuniting with her father in Connecticut, Linoshka and her family traveled to Puerto Rico for his funeral.

Linoshka never learned the details of her father's murder other than it involved jealousy and that he was gunned down in a barber shop. In the course of the mitigation investigation, two press releases issued by the U.S. Attorney's Office, Southern District of New York, were located that appear to shed light on Linoshka's father's death. One, dated July 14, 2021, states that an enforcer for La Organización de Narcotraficantes Unidos (aka La ONU) – a criminal enterprise involved in shipping cocaine from Puerto Rico to New York – was convicted of a role in a conspiracy to commit murder, to include the murder of Carlos Barbosa on March 20, 2009. United State Attorney's Office, Southern District of New York*, Enforcer of Violent Narcotics Trafficking Organization Sentenced to 35 Years in Prison for His Role in 7 Murders* [Press Release] (July 14, 2021), https://www.justice.gov/usao-sdny/pr/enforcer-violent-narcotics-trafficking-organization-sentenced-35-years-prison-his-role. Another press release, dated January 26, 2023, related to a different conviction, noted that Carlos Barbosa was murdered on March 20, 2009 on the orders of a La ONU leader because Carlos was believed to be plotting to seize power over certain territory. United State Attorney's Office, Southern District of New York, *Two Leaders of Violent Drug Cartel Sentenced to Life and 50 Years in Prison* [Press Release] (January 26, 2023), https://www.justice.gov/usao-sdny/pr/two-leaders-violent-drug-cartel-sentenced-life-and-50-years-prison. The press release documents that Carlos was shot over a dozen times while getting his hair cut at a barbershop in Levittown, Puerto Rico. *Id.*

**b. Linoshka Barbosa's Adolescence & Early Adulthood**

SLEIGH LAW
ATTORNEYS AT LAW
P.O. BOX 278
364 RAILROAD STREET, STE E
ST. JOHNSBURY, VT 05819
(802) 748-5176

In her early teens, Linoshka began dating Leonardo Laboy, a fellow student at Adelbrook in East Hartford, Connecticut. Although the relationship started positively, Leonardo became physically and emotionally abusive. Leonardo's abuse included kicking and hitting Linoshka, sometimes with a hanger or a belt. Leonardo blamed Linoshka for his abuse. Linoshka suffered black eyes and has permanent marks from the abuse, including a crooked finger and a scar. One time, Leonardo left Linoshka outside naked and bloody after beating her and ripping off her clothes.

Linoshka's mother involved authorities to get Linoshka back home and away from Leonardo as Linoshka was leaving home and staying with Leonardo for weeks at a time. Linoshka ended up on juvenile probation after being deemed a runaway. Despite the problems with Leonardo, Linoshka remained in the relationship until she was approximately 18. Linoshka speculates that she stayed so long because she was seeking something, having lost her father. In 2018, Leonardo went to jail for a gun charge.

At 19-years-old, Linoshka got pregnant by her new boyfriend, Leonard White. Linoshka was very excited about becoming a mother. However, six months into the pregnancy, Linoshka miscarried. Linoshka was devastated by the loss. Shortly thereafter, Linoshka began using Percocet, which she obtained from Leonard's friend. Prior to that time, Linoshka had dabbled recreationally with various illicit substances but never used anything regularly other than marijuana.

After Leonard went to jail, Leonard's friend helped Linoshka with food and her Percocet habit. For a time, Linoshka could obtain Percocet easily, but one day, there was none to find. She began to feel sick and someone offered Linoshka fentanyl. Desperate to feel better, Linoshka used it and felt relief. Thereafter, Linoshka used fentanyl when she

SLEIGH LAW
ATTORNEYS AT LAW
P.O. BOX 278
364 RAILROAD STREET, STE E
ST. JOHNSBURY, VT 05819
(802) 748-5176

could not obtain Percocet. She also dabbled in cocaine, but did not use it regularly.

When Leonard was released from jail, he found Linoshka ravaged by addiction. Leonard forced Linoshka to detox by shutting her in a room without a phone for two weeks. Thereafter, Leonard went back to jail for a gun charge. In his absence, Linoshka began using Percocet and fentanyl again.

At the time, Linoshka, still 19 years old, lived with a female roommate in Hartford, Connecticut. The roommate associated with drug dealers and prostituted herself. Around this time, Linoshka, in the throes of addiction, sold her body twice. The first time, she sold her body for just $20 after she had not eaten for days. The second time, the man who supported her made it a condition of his continued largesse. On that occasion, Linoshka had to do "everything under the sun" for $60. Linoshka had no job, no money, and was desperate. Linoshka had always told herself she would never cross that boundary. Three months later, Linoshka turned to selling drugs rather than her body. The latter was not an option. Linoshka could "only go to the shower and scrub herself so many times."

The boundary Linoshka crossed has a name: survival sex, which is a form of prostitution engaged in by people in extreme need. Kathleen Preble et al, *Understanding Survival Sex Engagement Among Sexual and Gender Minority Young Adults Experiencing Homelessness: A Seven-City Study Using Individual and Social Network Perspectives*, Journal of Human Trafficking, 1–7 (January 29, 2025), https://doi.org/10.1080/23322705.2025.2457927. It can involve the exchange of sex for food, shelter, other basic needs, or by an addict for drugs. *Id*. Survival sex is engaged in by homeless people, refugees, asylum seekers, and others disadvantaged in society.

SLEIGH LAW
ATTORNEYS AT LAW
P.O. BOX 278
364 RAILROAD STREET, STE E
ST. JOHNSBURY, VT 05819
(802) 748-5176

Later, the house Linoshka shared with her roommate was raided by police. Linoshka was using fentanyl at the time and selling on a small scale to maintain her habit. As a result, Linoshka was convicted of drug charges and placed on state probation in Connecticut.

Earlier in her life, Linoshka worked at Wendy's, McDonald's, and Six Flags New England. At the time of her arrest in the Connecticut state case, Linoshka worked for Federal Express in Wallingford, Connecticut, as a mail handler, earning approximately $17 per hour. Linoshka performed well on this job and aspired to work her way into management. However, Linoshka was fired by Federal Express due to the state drug case.

Linoshka's circumstances went from bad to worse. Due to her addiction, lack of education, and criminal record, she could not get a job. Linoshka's connections to her family had deteriorated. Linoshka was at a low point, sleeping on porches and in hallways. She often went without sleeping or showering. At about that time, Linoshka learned about the opportunity to make money in Vermont by selling drugs. Linoshka learned about this opportunity through friends who were already selling drugs in Vermont.

### c. Post-2023 Arrest

After her incarceration in October 2023, and on June 25, 2024, Linoshka gave birth to Ava Marie Cruz. Linoshka did not recognize she was pregnant for the first five months — in keeping with her pattern of denial for survival. Becoming a mother has changed Linoshka profoundly. Linoshka's journey has come full circle: from a loved child, to a broken child, to addiction, to survival sex, to participation in drug trafficking, and now to being the mother of a loved child. Linoshka believes her time in prison will

SLEIGH LAW
ATTORNEYS AT LAW
P.O. BOX 278
364 RAILROAD STREET, STE E
ST. JOHNSBURY, VT 05819
(802) 748-5176

serve as a rite of passage in becoming the individual she was meant to be.

While incarcerated, Linoshka has shown a dedication to learning by engaging in numerous programs that provide life and technical skills. Linoshka is currently working towards obtaining her high school diploma. Linoshka has obtained several certifications: Adult First Aid/CPR certification; Trained Flagger (by the VT Work Safety Council); OSHA's 10-hour General Industry certification (a voluntary training program that teaches basic safety and health information to workers); and ServSafe Program certification (designed for foodservice and hospitality personnel and is recognized as a mark of excellence in food safety training). Linoshka has also completed a course in restorative justice. These accomplishments have encouraged Linoshka to push herself further.

Linoshka fully participated in the SOAR program (a comprehensive evidenced-based treatment program for persons suffering from substance abuse) while held in Merrimack County, New Hampshire. Linoshka was inspired by the program's administrator, Frank Caron, who himself conquered his addiction and now helps others do the same. Linoshka is now clean of all illicit drugs. Consistent with Linoshka's lifelong grit, she has not used, nor is she currently using, any form of Medication-Assisted Treatment (MAT). The only medication Linoshka is currently taking is an antidepressant to treat her depression.

### d. The Impact of Childhood Trauma on Linoshka Barbosa

The CDC-Kaiser Permanente Adverse Childhood Experiences (ACE) study is one of the largest investigations of childhood trauma and its relation to adult health and well-being. U.S. Centers for Disease Control and Prevention, *About Adverse Childhood Experiences* (2024), https://www.cdc.gov/aces/about/index.html; Cleveland Clinic,

SLEIGH LAW
ATTORNEYS AT LAW
P.O. BOX 278
364 RAILROAD STREET, STE E
ST. JOHNSBURY, VT 05819
(802) 748-5176

*Adverse Childhood Experiences (ACEs)* (2023),

https://my.clevelandclinic.org/health/symptoms/24875-adverse-childhood-experiences-ace. The original ACE study was conducted at Kaiser Permanente from 1995 to 1997. The ACE questionnaire focuses on experiences in the first 18 years of life related to abuse (emotional, physical abuse and/or sexual); household challenges (domestic abuse of parent; divorce/separation of parents; substance and/or mental illness in household; incarcerated family member); and neglect (physical and/or emotional).

An individual's ACE score represents the number of adverse childhood experiences that person has had. The ACE questionnaire for adults was given to Linoshka and she scored 6/10. Research has shown the higher the ACE score, the more likely a person is to experience serious health challenges. Individuals with ACE scores of 4 or more were 12 times more likely to have attempted suicide, 7 times more likely to be alcoholic, and 10 times more likely to have injected street drugs. People with ACE scores of 6 and higher have an almost 20-year shortening of lifespan.

### e.  Linoshka Barbosa's Mental Health History

After her father's death, Linoshka fell apart. Linoshka stopped wanting to go to school and began to act out. Linoshka experienced auditory and visual hallucinations, seeing shadows and sometimes hearing her father's voice. Linoshka's family thought she was possessed. Around the age of 12, Linoshka began self-harming herself. Linoshka's mother found her a therapist at The Village.[2] Linoshka saw the same therapist, Luz Lopez, from when she was approximately 9 years old until she was approximately 16

**SLEIGH LAW**
**ATTORNEYS AT LAW**
**P.O. BOX 278**
**364 RAILROAD STREET, STE E**
**ST. JOHNSBURY, VT 05819**
**(802) 748-5176**

[2] According to The Village's website: "The Village was one of the first agencies in the country to provide homes for neglected children…providing a full range of behavioral health, early childhood and youth development, substance use treatment and support services for children, adults and families in the Greater Hartford, Connecticut region. Our more than 500 professional staff members include child psychologists, clinicians, social workers and parent educators."

years old. Linoshka's diagnoses include bipolar disorder, psychotic disorder, anxiety, depression, attention deficit hyperactivity disorder (ADHD), and post-traumatic stress disorder (PTSD).

Medical records obtained from Connecticut Children's Hospital, See, Defense Exhibit B, Connecticut Children's Hospital Records (attached hereto), and the Institute of Living (IOL), See, Defense Exhibit C, Institute of Living Records (attached hereto), a psychiatric facility in Hartford, provide the following details:

- In October 2013, Linoshka, age 13, was brought to Connecticut Children's Hospital by ambulance from The Villages due to concerns about suicidal ideation. Linoshka was sending farewell messages to friends and family and experiencing hallucinations, which included hearing her father telling her to be good.

- In March 2014, Linoshka, then 14-years-old and in the 8th grade, was brought by ambulance to Connecticut Children's Hospital for a mental health crisis after a verbal and physical fight with her mother. Linoshka's records document that she had been receiving therapy and medication management (Prozac, Risperdal, and Trazodone)[3] at The Villages for the last 3—4 years. Linoshka's therapist reported that Linoshka was experiencing hallucinations, made frequent suicidal statements, and spoke about wanting to be with her deceased father. Linoshka's history of trauma was noted as follows: "Pts father was murdered 3 yrs ago. Pt was very

SLEIGH LAW

ATTORNEYS AT LAW

P.O. BOX 278

364 RAILROAD STREET, STE E

ST. JOHNSBURY, VT 05819

(802) 748-5176

---

[3] According to the Mayo Clinic's website, Prozac is a common antidepressant, Risperidone is used to treat schizophrenia, bipolar disorder, and/or irritability, aggression, self-injury and sudden mood changes, and Trazodone is used for depression and anxiety/sedation.

close to him, traumatized by his death…Pt talked to father on phone while

he was in prison in PR. Was scheduled to come to US on a Sunday was

killed that Friday prior to coming to US." According to Linoshka's

mother's input, Linoshka's problems emerged after her father's death.

Linoshka's mother also reported that Linoshka heard voices and saw

shadows. Linoshka was transferred to psychiatric in-patient treatment at

the Institute of Living for psychiatric stabilization. Linoshka was

discharged two days later.

- In May 2014, Linoshka was seen at Connecticut Children's Hospital

  Emergency Department for a mental health concern. Linoshka had become

  upset and aggressive in a therapy session and 911 was called. Linoshka

  was discharged to return home with her mother.

- In April 2015, Linoshka, then 15-years-old and a 9th grader, arrived at

  Connecticut Children's Hospital's Emergency Department with seizure-

  like symptoms and cardiac complications after overdosing on prescription

  medication. During the psychiatric evaluation, Linoshka denied suicidal

  intentions (though Linoshka later admitted she intended to take her own

  life). Linoshka's condition was tied to the loss of her father: "Pt presents

  with nightmares, mood changes since her father's death by homicide the

  day before he was supposed to see her…She endures nightmares, hearing

  her father's voice." Linoshka was admitted into the hospital and monitored

  for several days before being released to her mother. The records state:

  "Linoshka is a 15 yo female with extensive psychiatric illnesses that

SLEIGH LAW
ATTORNEYS AT LAW
P.O. BOX 278
364 RAILROAD STREET, STE E
ST. JOHNSBURY, VT 05819
(802) 748-5176

include ADHD, OBD and bipolar disorder" and "multiple people in household on multiple medications for mental health issues." Inpatient placement was considered, but Linoshka was instead released to her mother and referred to a child/adolescent outpatient treatment program.

- In September 2015, Linoshka was brought to Connecticut Children's Hospital by ambulance and in restraints following an outburst. At the hospital, Linoshka underwent a psychiatric evaluation. The records note Linoshka's psychiatric history and her hospitalization for the overdose. The records also document concerns about Wolff-Parkinson-White syndrome (a cardiac condition) and that Linoshka was taken off all her medications (Prozac, Risperdal, and Trazodone) pending a cardiology workup (noting two abnormal EKGs in April 2015). The records also note that Linoshka was kicked out of The Village program for behavior issues. Linoshka did not meet the criteria for inpatient admission and was discharged home to her mother's care with a referral for services.

The records demonstrate that Linoshka was a child in crisis or on the edge of a crisis and that her mental health treatment needs were more significant than those provided. The medical records also indicate Zoquia's was an engaged and caring mother, providing input for the medical staff and staying with Linoshka at the hospital.

Linoshka's suicide attempt is part of a disturbing statistic. The high rate of suicide attempts by Latina adolescent girls is not well understood and is the subject of a current study sponsored by the National Institutes of Health. Lauren E. Gulbas, PhD and Luis H. Zayas, PhD., *Why Adolescent Latinas Attempt Suicide More Than Other Females*,

SLEIGH LAW
ATTORNEYS AT LAW
P.O. BOX 278
364 RAILROAD STREET, STE E
ST. JOHNSBURY, VT 05819
(802) 748-5176

National Institute on Minority Health and Health Disparities (2020),

https://socialwork.utexas.edu/projects/why-adolescent-latinas-attempt-suicide-more-than-other-females/. The study's researchers observed that even after three decades of CDC surveys showing that adolescent Latinas attempt suicide at rates much higher than African-American and non-Hispanic girls, no study has explained why. *Id*. One researcher posited that the causes may be the convergence of cultural and familial factors with developmental, social, and individual factors. *Id*. Further, suicidal Latina girls reported "more periods of father-absence in their lives than nonsuicidal girls" – a factor experienced by Linoshka when she suddenly lost her father at the onset of adolescence. *Id*.

Research hints that a clash of cultures is one source of the problem: "…the combined effects of adolescent development and acculturative stress — due in large part to the fact that the parents did not experience these challenges and therefore do not have the knowledge to impart — reduces their capacity to provide reliable support, inspiration, care, and influence toward adaptive choices…In traditional Hispanic cultures, family is the primary unit — in contrast to modern American culture that places the individual at the core…While in most cultures the socialization that occurs during adolescence focuses on the preparation for adulthood, there is a nuanced difference between traditional Hispanic cultures and contemporary American culture. In traditional Hispanic cultures, adulthood is primarily interpreted in the socialization process as readying a person for *parenthood*, which reinforces the obligation to family." Allyson M. Pilat and Luis H. Zayas, PhD, *Suicidal Behavior in Latinas: Explanatory Cultural Factors and Implications for Intervention*, Suicide and Life-Threatening Behavior, 38, 334-342 (June

**SLEIGH LAW**
**ATTORNEYS AT LAW**
**P.O. BOX 278**
**364 RAILROAD STREET, STE E**
**ST. JOHNSBURY, VT 05819**
**(802) 748-5176**

2008), https://pmc.ncbi.nlm.nih.gov/articles/PMC2662359/.

One can only imagine how lost Linoshka felt as a developing young woman given all the environmental stressors she was confronted by. Though Linoshka experienced her mother as attentive and devoted (and medical records support Linoshka's description), one can only imagine Zoquia's struggles raising four children (two with disabilities) as a single mother with limited resources, having her own mental health struggles, having to navigate the aforementioned challenges of raising a bi-cultural adolescent as a single parent, and facing unrelenting language barriers as a non-English speaker.

### f.  Linoshka Barbosa's Education History

Linoshka's school records tell the story of a girl who was behind academically, suffering from emotional problems, and acting out. The earliest school records obtained date back to 2010, the year after her father's death. At that time, Linoshka was a student at Carmen Arace in Bloomfield, Connecticut. See, Defense Exhibit D, Carmen Arace Intermediate School Records (attached hereto). The 2010 records document that Linoshka was performing below basic grade level in math and reading. *Id*. Records at the same school in 2011 and 2012 show Linoshka's difficulty in almost all subjects. *Id*. One teacher noted a problem with math facts and frequent absences. *Id*. Despite these concerns, Linoshka was described as respectful, quiet, and "a pleasure to have in class." *Id*.

According to school records, Linoshka, then 13-years-old and in the 8th grade at MD Fox School in Hartford, Connecticut, was referred to a school psychologist for an evaluation due to concerns about her behavior and emotional problems. See, Defense Exhibit E, Hartford, Connecticut School Records (attached hereto). The evaluating

SLEIGH LAW
ATTORNEYS AT LAW
P.O. BOX 278
364 RAILROAD STREET, STE E
ST. JOHNSBURY, VT 05819
(802) 748-5176

psychologist, Dr. Carlos Ortiz-Longo, observed in his report that Linoshka felt sad,

worried a lot, and believed her life was going downhill. *Id*. The report noted that

Linoshka heard voices in her head, had problems sleeping, always felt on edge, feared

losing control, that her hands shook and her heart pounded hard on occasion, and that she

had trouble calming down after a triggering incident. *Id*. Dr. Ortiz-Longo recommended

therapeutic services for Linoshka's behavioral and emotional difficulties "with particular

attention to her low self-esteem (sense of inadequacy), anxiety, depressive feelings, and

resulting disruptive behaviors." *Id*. He further noted that "[h]er current behavioral and

emotional status seems to be a main factor behind her current general functioning." *Id*.

In October 2013, Linoshka qualified for special education services due to a

"serious emotional disturbance" and a behavioral intervention plan was developed. *Id*.

Planning and Placement Team (PPT) documents related to Linoshka's

Individualized Education Program (IEP) in the subsequent months and years identified

emotional disturbance as Linoshka's primary disability. *Id*.

In January 2014, a special education department social work report provided

significant insight into Linoshka's background and struggles after her father's death:

> "Linoshka lives with her mother, Zoquia Barbosa, and her three younger
>
> siblings, all of whom attend this school. Father is deceased, having been
>
> murdered approximately three years ago shortly after his release from
>
> incarceration. This has been a major trauma for this young teenager who is
>
> still heavily impacted by this tragic loss…Linoshka was a full term baby
>
> and there were no concerns during the pregnancy or delivery nor in the
>
> neonatal period. All developmental milestones were appropriately

SLEIGH LAW
ATTORNEYS AT LAW
P.O. BOX 278
364 RAILROAD STREET, STE E
ST. JOHNSBURY, VT 05819
(802) 748-5176

achieved, age wise, and her only ongoing health concern is asthma. Student attended preschool only in Puerto Rico then came to the USA and attended Maria Sanchez School, Moylan, Carmen Arace in Bloomfield, then MD Fox since sixth grade. She is presently in eighth grade. Linoshka continues to be a challenging student who struggles with self-regulation of her emotions and is sometimes irritable, oppositional and easily provoked. She can also be very affectionate at times and has made some positive attachments with some staff. Mother reports that Linoshka was a very good student and a very good daughter up to the time of her father's tragic death. After this, there was a major change in behavior, including auditory, visual and tactile hallucinations, oppositional behavior, mood swings and leaving home without permission. These behaviours are present both at home and at school. She also has sleep disturbances. Linoshka…has formed a very healthy therapeutic relationship with Ms. Lopez, her clinician, who has been treating her for the past three years… Linoshka has been given a diagnosis by the Village professionals of Psychotic Disorder, PTSD and Conduct Disorder. She is also presently being treated with medication. It is reported that mother and maternal grandmother have histories of depressive disorders. Father was incarcerated when she was six years old, after which time mother brought her to the USA. Mother's second daughter shares the same father as Linoshka. When Linoshka's father was murdered, she returned to Puerto Rico with said sister for his funeral. Although she had spent some years

SLEIGH LAW
ATTORNEYS AT LAW
P.O. BOX 278
364 RAILROAD STREET, STE E
ST. JOHNSBURY, VT 05819
(802) 748-5176

away from him, she was very close to her dad and kept in touch with him mostly through phone calls…Student is a young, attractive teenaged girl with a history of trauma, and significant symptoms all of which have contributed to her diagnosis. These factors are challenging her abilities to cope successfully in the school setting and elsewhere and her relationships across settings. However she can sometimes be appropriately warm and endearing with some staff and peers and particularly with her therapist with whom she has been working for approximately three years…" *Id*.

An October 2014 report noted that outside the negative influence of peers, Linoshka was a respectful and willing participant in school. *Id*. Linoshka's behaviors were considered a manifestation of her disability. *Id*.

In April 2014, the PPT reported a decision to place Linoshka at Adelbrook, a full-time special education setting in East Hartford, Connecticut. *Id*. By June 2014, records indicate that Linoshka was enrolled in Adelbrook. *Id*. In October 2014, the PPT report showed that while at Adelbrook, Linoshka's attendance had improved 90% and that she was making progress academically. *Id*.

In April 2016, a PPT report indicated Linoshka had developed good relationships with staff and peers and showed an ability to stay on task and participated in vocational programs. *Id*. However, she still struggled with appropriate behavior with persons she had not yet developed a positive relationship with. *Id*. In September 2016, the PPT report showed continued academic, social, and emotional improvement. *Id*.

In October 2016, Linoshka was given another psychological assessment to determine her eligibility for special education. *Id*. The psychologist's report observed

SLEIGH LAW
ATTORNEYS AT LAW
P.O. BOX 278
364 RAILROAD STREET, STE E
ST. JOHNSBURY, VT 05819
(802) 748-5176

Linoshka's intelligence testing showed her to be a bright girl with age-appropriate cognitive abilities. *Id*. The report also noted that previous teachers described Linoshka as an organized student who participated well in class, took pride in her work, and demonstrated excellent effort in class. *Id*.

By September 23, 2017, school records indicated that Linoshka's special education case was closed because she had moved out of the school district. *Id*. According to Linoshka, she dropped out of school in the 11th grade.

### g. Understanding Linoshka's Story in a Historical Context

Linoshka's conduct cannot be understood outside the broader history and circumstances into which she was born. This history is explained succinctly and powerfully by researchers:

> Over the 20th century, Puerto Ricans migrated to mainland cities in enormous numbers. The history of the island, a locus of colonial competition because of its strategic position in trans-Atlantic shipping networks, reflected the military and economic interests of their colonizers, first the Spanish and then the United States. Colonial underdevelopment propelled a third of Puerto Rico's population to emigrate to the mainland as low-cost factory and farm workers. Although migration to the continental United States was promoted by US government policies, Puerto Ricans were met with hostility in the host country. Ever since their arrival in the United States they have been despised and humiliated with a virulence that is specific to North America's history of polarized race relations and ethnically segmented immigrant labor markets. Like African-

**SLEIGH LAW**
**ATTORNEYS AT LAW**
**P.O. BOX 278**
**364 RAILROAD STREET, STE E**
**ST. JOHNSBURY, VT 05819**
**(802) 748-5176**

Americans, Puerto Ricans were contained in ghettos which concentrated poverty and intensified the effects of discrimination. The Puerto Rican community was assuming the heavy risks and social stigma of supplying drugs to higher status white outsiders. An anthropologist working in Hartford in the 1980s and 1990s, noted, "We have observed a similar pattern in Hartford…This arrangement creates 'job opportunities' in the drug trade for many Puerto Rican youth." In fact, ethnic concentration in segregated and impoverished urban enclaves has regularly been associated with large-scale drug "epidemics" in the United States, often inciting virulent racist backlash.

Daniel Rosenblum et al, *Urban Segregation and the US Heroin Market: A Quantitative Model of Anthropological Hypotheses from an Inner-City Drug Market*, International Journal of Drug Policy, 25(3), 543-555 (2014), https://www.sciencedirect.com/science/article/abs/pii/S0955395913002375.

Many sources point out that the War on Drugs, which started in the 1970s and continues today, has unfairly targeted minorities, such as Linoshka.

A "country of minorities," Puerto Rico is not only a prime target of the War on Drugs, but it is also a key drug portal to the U.S. and the Caribbean and the rates of crime and drug addiction are among the highest in the world. The War on Drugs in Puerto Rico has created an inner-city ghetto in a beautiful tropical paradise. The escalation in drug enforcement dramatically affects minority communities, particularly the African American and Latino communities. The rates of incarceration for

SLEIGH LAW
ATTORNEYS AT LAW
P.O. BOX 278
364 RAILROAD STREET, STE E
ST. JOHNSBURY, VT 05819
(802) 748-5176

minorities are significantly higher than those for Caucasians.

Consequently, minorities are overrepresented in the federal prison system

in relation to their representation in the overall population. Two major

reasons for higher rates of incarceration for minorities involved in drug

related offenses are the drug laws themselves and the nature of their

enforcement. First, the laws are more likely to be enforced against

minorities. Second, the laws target the minority population. While on their

face the laws seem to be racially neutral, they are not racially neutral in

their application.

Jennifer Gumbrewicz and LeeAnn O'Neill, *Our Forgotten Colony: Puerto Rico and the War on Drugs*, The Modern American*, 8-11 (2005),

https://digitalcommons.wcl.american.edu/cgi/viewcontent.cgi?article=1120&context=tma

.

## IV.    <u>Sentencing Recommendation</u>

According to the PSR, two of Linoshka's co-defendants with similar or greater

participation in the instant conspiracy have already been sentenced. Nathan Delgado and

Jason White each were sentenced to serve 60 months. Despite each also having

involvement with firearms during the course of the drug dealing, neither faced gun

charges requiring a mandatory minimum or consecutive sentences.[4] Linoshka was not so

lucky. Nevertheless, 18 U.S.C. § 3553(a)(6) requires the Court to impose a sentence "that

SLEIGH LAW

ATTORNEYS AT LAW

P.O. BOX 278

364 RAILROAD STREET, STE E

ST. JOHNSBURY, VT 05819

(802) 748-5176

---

[4] It is generally acknowledged that the prosector has enormous influence over the sentencing of a criminal defendant by virtue of control over the charging decision. See, generally, National Research Council. (2014). *The Growth of Incarceration in the United States: Exploring Causes and Consequences. Committee on Causes and Consequences of High Rates of Incarceration*, J. Travis, B. Western, and S. Redburn, Editors. Committee on Law and Justice, Division of Behavioral and Social Sciences and Education. The National Academies Press. https://doi.org/10.17226/18613.

avoids unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." Understanding that a 5-year mandatory minimum and consecutive sentence applies to Count One by virtue of her conviction on Count 2, 18 U.S.C. § 924(c)(1)(D)(ii), Ms. Barbosa prays the Court to sentence her to serve 12 months on Count One with the 5-year consecutive mandatory minimum in Count 2 applied thereto. She intends to seek an overall sentence of 72 months.


DATED at St. Johnsbury, VT, on May 9, 2025

> By: /s/ David C. Sleigh
> Sleigh Law
> PO Box 278
> 364 Railroad Street, Ste. E
> St. Johnsbury, VT 05819
> 802-748-5176
> julie@sleighlaw.com

SLEIGH LAW

ATTORNEYS AT LAW

P.O. BOX 278

364 RAILROAD STREET, STE E

ST. JOHNSBURY, VT 05819

(802) 748-5176